AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

District of Delaware

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

One white Nissan NV Cargo Van Bearing Delaware
license plate CL75556

)
)
)
)
)
)

Case No. 20- 57M

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A

REDACTED

located in the _____ District of _____ Delaware _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

MAR - 9 2020

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 1341, 1343, 1349 | Mail Fraud, Wire Fraud, Conspiracy to Commit Mail and Wire Fraud |
| 21 U.S.C. §§ 331, 333, 352 | Misbranding of Drugs and Devices |

The application is based on these facts:
See attached Affidavit and Exhibit 1.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Jennifer Taylor, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: __3/9/20__

_____
*Judge's signature*

City and state:  Wilmington, Delaware

Hon. Mary Pat Thynge, Chief U.S. Magistrate Judge
*Printed name and title*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

IN THE MATTER OF THE SEARCH OF:

One white Nissan NV Cargo Van Bearing
Delaware license plate CL75556

Case No. 20- 57m

I, JENNIFER TAYLOR, a Special Agent with the Federal Bureau of Investigation ("FBI"),

being duly sworn, deposes and states as follows:

## I.  Introduction and Affiant Background

1.  I am currently assigned to the investigation of DONATA POLISENO and LOUIS

GRASSO (collectively, the "Target Subjects"), among others, related to a scheme to engage in the

procurement, development, manufacture, shipment, purchase, sale, or distribution of custom-

made, adulterated and/or misbranded drugs.

2.  As set forth below, there is probable cause to believe that the Target Subjects are

engaging in a scheme to obtain, distribute, and administer adulterated and/or misbranded drugs in

order to defraud racetracks by placing and racing horses in races after secretly administering such

substances to the racing horse in violation of 18 U.S.C. § 1341 (mail fraud); 18 U.S.C. § 1343

(wire fraud); 18 U.S.C. § 1349 (conspiracy to commit mail and wire fraud); and 21 U.S.C. §§ 331,

333, 352 (misbranding of drugs and devices) (collectively, the "Subject Offenses").

3.  I make this Affidavit in support of an application pursuant to Rule 41 of the Federal

Rules of Criminal Procedure for a warrant for the vehicle described as one white Nissan NV Cargo

Van bearing Delaware license plate CL75556 (the "Poliseno Target Vehicle"), currently located

at the premises at                          , Hartley, Delaware, 19953, more particularly described

in Attachment A. As outlined below, there is probable cause to believe that evidence, fruits and

2019.11.19

instrumentalities of the above-enumerated offenses – more particularly described in Attachment B – will be found in the Poliseno Target Vehicle.

4.      I am a Special Agent with the FBI and have been for approximately two and a half years. As such, I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant. I am currently assigned to the Eurasian Organized Crime Task Force, a squad that investigates, among other things, racketeering and organized crime and I have been personally involved in the investigation described further below. During my time with the FBI, I have participated in investigations of racketeering enterprises, illegal gambling operations, unlawful drug trafficking, and violent crimes and, among other things, have conducted or participated in surveillance, the execution of search warrants and cellphone location-tracking orders and warrants, and debriefings of informants. I have also participated in the investigation of the supply, distribution, administration, and testing of prohibited substances within the context of professional horseracing. Through my training, education and experience, and from my conversations with other agents involved in this investigation, I have become familiar with the structure, hierarchies, and organization of organized criminal groups and complex criminal networks, and the manner in which such groups and networks operate to engage in various fraudulent schemes and the "lingo" and coded language used by the members and associates of such groups and networks.

5.      This affidavit is based upon my personal knowledge; my review of documents and other evidence; my conversations with other law enforcement personnel; and my training and experience. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my

investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

## II.  Probable Cause

### A.  Horse Doping Investigation

6.      On or about March 6, 2020, the Hon. Mary Pat Thynge, Chief United States Magistrate Judge, authorized a search warrant for _        .. _____, Hartley, Delaware, 19953, the residence and office of DONATO POLISENO (the "Poliseno Residence"). The affidavit in support of that warrant is attached as Exhibit 1, hereto, and incorporated herein.

### B.  Poliseno

7.      On or about March 9, 2020, the FBI arrested DONATO POLISENO and searched                         , Hartley, Delaware 19953. At that time, law enforcement observed the Poliseno Target Vehicle parked in the driveway of the Poliseno Residence. From the exterior of the Poliseno Target Vehicle, law enforcement was able to observe, through the rear window of that vehicle, what appears to be a mobile pharmacy. Among other substances, law enforcement was able to view a bottle appearing to be from "Rapid Equine" (which, from my conversations with other agents assigned to this case, and from my review of recorded conversations, including that quoted in Paragraph 15 of Exhibit 1, I understand to be an equine drug distributor from which POLISENO obtained drugs for use in compounding and creating PEDs); "P-Block," which appears to be consistent with labeling for an analgesic, or "pain blocking," substance; and saline solution, which I understand to be used to mix certain PEDs. Law enforcement also observed packages bearing UPS ground mailing labels directing shipments by "Midwest Veterinary Supply" to the Poliseno Residence.

## III.  Conclusion

8.     Based on the foregoing, I submit that probable cause exists to believe that the
Poliseno Target Vehicle, described in Attachment A, contain the items listed in Attachment B,
which are believed to be evidence, fruits, property designed for use, intended for use, or used in
committing violations of 18 U.S.C. § 1341 (mail fraud); 18 U.S.C. § 1343 (wire fraud); 18 U.S.C.
§ 1349 (conspiracy to commit mail and wire fraud); and 21 U.S.C. §§ 331, 333, 352 (misbranding
of drugs and devices).


                                        JENNIFER TAYLOR
                                        Special Agent
                                        Federal Bureau of Investigation

Sworn to before me on
 **9** day of March, 2020


HON. MARY PAT THYNGE
CHIEF UNITED STATES MAGISTRATE JUDGE
DISTRICT OF DELAWARE

## ATTACHMENT A

### Premises to be Searched

The premises to be searched, the Poliseno Target Vehicle, are described as follows, and include all locked and closed containers found therein:

One white Nissan NV Cargo Van bearing Delaware license plate CL75556.

**ATTACHMENT B**

**Items to Be Seized**

## A. Evidence, Fruits, and Instrumentalities of the Subject Offenses

The items to be seized from the Poliseno Target Vehicle consist of the following evidence, fruits, and instrumentalities of violations of mail fraud, in violation of 18 U.S.C. § 1341; wire fraud, in violation of 18 U.S.C. § 1343; conspiracy to commit mail and wire fraud, in violation of 18 U.S.C. § 1349; and misbranding of drugs and devices, in violation of 21 U.S.C. §§ 331, 333, 352, relating to a scheme to obtain, distribute, and administer adulterated and/or misbranded drugs in order to defraud racetracks by placing and racing horses in races after secretly administering such substances to the racing horse (the "Subject Offenses") described as follows:

1.      Evidence concerning ownership of the Poliseno Target Vehicle, including without limitation identification documents, keys, and vehicle registration information.

2.      Correspondence and records pertaining to the procurement, development, manufacture, shipment, purchase, sale, or distribution of adulterated and/or misbranded drugs including, but not limited to envelopes, letters, mailings, electronic mail, chat logs, electronic messages, books, ledgers, and records bearing on the production, reproduction, receipt, shipment, orders, requests, trades, purchases, or transactions involving misbranded and/or adulterated drugs.

3.      Information or correspondence pertaining to the procurement, development, manufacture, shipment, purchase, sale, or distribution of adulterated and/or misbranded drugs.

4.      Any records of customers, suppliers, manufacturers, compounders, employees, or other individuals engaged in the procurement, development, manufacture, shipment, purchase, sale, or distribution of adulterated and/or misbranded drugs.

5.      Any misbranded and/or adulterated drugs (including non-FDA approved drugs), pharmaceutical ingredients and products that may be used in the production of such products; paraphernalia used to administer, compound, or manufacture such products; and all labeling, packaging, literature, inserts, and other materials pertaining to such products.

6.      All business records, contracts, agreements and related correspondence, in whatever form, including handwritten and computer generated, involving the acquisition, manufacture, development, sale, distribution, and administration of misbranded, adulterated, or unapproved drugs, and any associated business entities pertaining to the illegal purchase, possession, and unauthorized distribution of any of drugs, pharmaceutical ingredients and products and misbranded and/or adulterated drugs.

7.      Address books, mailing lists, supplier lists, and any and all documents and records pertaining to the preparation, purchase, and acquisition of names or lists of names pertaining to the purchasing and selling of any drugs, pharmaceutical ingredients and products, and misbranded, adulterated or unapproved drugs.

1

8.    Evidence of purchases and sales of drugs, pharmaceutical ingredients and products and misbranded, adulterated or unapproved drugs, to include not limited to, bank statements, credit card statements, cancelled checks and checkbooks.

# EXHIBIT 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

IN THE MATTER OF THE SEARCH OF:

_____, Hartley, Delaware,
19953

Case No. 20-

**Filed Under Seal**

I, DONALD L. FISHER, a Special Agent with the Federal Bureau of Investigation ("FBI"), being duly sworn, deposes and states as follows:

## I.  Introduction and Affiant Background

1.      I am currently assigned to the investigation of DONATA POLISENO and LOUIS GRASSO (collectively, the "Target Subjects"), among others, related to a scheme to engage in the procurement, development, manufacture, shipment, purchase, sale, or distribution of custom-made, adulterated and/or misbranded drugs.

2.      As set forth below, there is probable cause to believe that the Target Subjects are engaging in a scheme to obtain, distribute, and administer adulterated and/or misbranded drugs in order to defraud racetracks by placing and racing horses in races after secretly administering such substances to the racing horse in violation of 18 U.S.C. § 1341 (mail fraud); 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 1349 (conspiracy to commit mail and wire fraud); and 21 U.S.C. §§ 331, 333, 352 (misbranding of drugs and devices) (collectively, the "Subject Offenses").

3.      I make this Affidavit in support of an application pursuant to Rule 41 of the Federal Rules of Criminal Procedure for a warrant to the premises at _____, Hartley, Delaware, 19953 (the "Poliseno Target Premises"), more particularly described in Attachment A. As outlined below, there is probable cause to believe that evidence, fruits and instrumentalities of

the above-enumerated offenses – more particularly described in Attachment B – will be found at the Poliseno Target Premises.

4.      I am a Special Agent with the FBI and have been for approximately two years. As such, I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant. I am currently assigned to the Eurasian Organized Crime Task Force, a squad that investigates, among other things, racketeering and organized crime and I have been personally involved in the investigation described further below. During my time with the FBI, I have participated in investigations of racketeering enterprises, illegal gambling operations, extortion, unlawful drug trafficking, and violent crimes, including robbery and, among other things, have conducted or participated in surveillance, the execution of search warrants and cellphone location-tracking orders and warrants, and debriefings of informants. I have also participated in the execution of search warrants for electronically stored information ("ESI"). I have also participated in the investigation of the supply, distribution, administration, and testing of prohibited substances within the context of professional horseracing, and of the financing of both that illicit activity and the racing of "doped" horses. Through my training, education and experience, and from my conversations with other agents involved in this investigation, I have become familiar with the structure, hierarchies, and organization of organized criminal groups and complex criminal networks, and the manner in which such groups and networks operate to engage in various fraudulent schemes, extortion, illegal gambling, and other offenses, and the "lingo" and coded language used by the members and associates of such groups and networks. In many of those investigations I participated in the seizure

2

of ESI in connection with the execution of those search warrants, and have reviewed ESI, of the type requested here.

5.      This affidavit is based upon my personal knowledge; my review of documents and other evidence; my conversations with other law enforcement personnel; and my training, experience and advice received concerning the use of computers in criminal activity and the forensic analysis of ESI. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

## II.  Probable Cause

### A.  Horse Doping Investigation

6.      Since in or about 2017, the FBI has been engaged in an investigation (the "Investigation") into various fraudulent schemes centered around professional horseracing and the gambling, sale, and breeding of race horses. Those schemes have involved the provision of controlled and banned substances to race horses stabled and raced in the Southern District of New York and the area around New York City, and misrepresentations to state racing commissions, the gambling public, racetracks, and buyers of race horses, among others, regarding the "doping" of those animals. The Target Subjects of this investigation have engaged in repeated efforts to obtain, distribute, or administer prohibited substances for use in doping horses that they each train, race, or treat.

7.      During the course of the investigation, law enforcement has obtained a judicially authorized wiretap from a District Court judge sitting in the Southern District of New York on the cellular telephone associated with LOUIS GRASSO (the "Grasso Phone"); multiple additional

wiretaps on other Target Subjects of the investigation, all issued by District Court Judges in the Southern District of New York; numerous pen register orders issued by Magistrate Judges of the Southern District of New York; and grand jury subpoena returns relating to the cellular telephones associated with GRASSO and POLISENO. Moreover, and as set forth in more detail below, law enforcement has engaged in multiple undercover purchases of PEDs from both GRASSO and POLISENO.

8.     From my participation in this investigation, and based on my training and experience, I have learned that drugs may be deemed "misbranded" or "adulterated" for several reasons, including, in relevant part: (1) if the drug is a new animal drug that does not have the requisite approvals or conditional approvals for use on animals by the Food and Drug Administration ("FDA"); (2) if drugs requiring a prescription are administered without a valid prescription, that is, not in the usual course of a veterinarian's professional practice, or not administered pursuant to any prescription at all;[1] or (3) if a drug's labeling is deficient in some respect, for example, if the label is false or misleading or does not accurately list details regarding the manufacturer, packer, or distributor, the contents of the packaging, or directions for use.

9.     Several legal regimes are of particular relevance given the location of sales and horseraces in which Target Subjects are involved:

a.     The New York Gaming Commission has promulgated rules relating to banned and controlled substances, including N.Y.C.R.R., Title 9, Section 4043.1, *et seq.*, entitled "Drugs Prohibited and Other Prohibitions." Section 4043. These and related provisions of the New

---

[1] In relevant part, drugs may require a prescription based on several factors, including the method of administration, or if they have the potentiality for harmful effect. In such cases, the drug may *only* be dispensed upon the lawful written or oral order of a licensed veterinarian in the course of the veterinarian's professional practice. 21 U.S.C. § 353(f)(1)(A).

4

York Code of Rules and Regulations are referred to hereafter as the "New York Rules." These New York Rules incorporate, in part, the bans on substances set forth in the Association of Racing Commissioners International's Model Rule ARCI-011-015 Version 7.0 (approved December 9, 2016). The New York Rules further ban "other doping agents," defined as "a substance that is not described in subdivision (a) of this section or the ARCI Prohibited List, has a pharmacologic potential to alter materially the performance of a horse, had no generally accepted medical use in the horse when treated, and is capable at any time of causing an action or effect, or both, within one or more of the blood, cardiovascular, digestive, endocrine, immune, musculoskeletal, nervous, reproductive, respiratory, or urinary mammalian body systems . . .; but . . . not a substance that is considered to have no effect on the physiology of a horse except to improve nutrition or treat or prevent infections or parasite infestations." Interfering with drug testing is prohibited by the New York Rules. *See* 9 N.Y.C.R.R. 4012.3(a)(2), (b)(3).

   b. The New Jersey Administrative Code, section 13:70-14A.1, sets out a list of prohibited drugs and "foreign substances," which, on the day of a race, no horse may carry in its body. That list includes "any drug and/or substance foreign to the natural horse," examples of which are provided in the same regulation and include "chemical substances," "stimulants," "depressants," "anesthetics," "tranquilizers," "anti-inflammatories," and "Erythropoietin" (known as "epo"). This and related provisions of the New Jersey Administrative Code are referred to hereafter as the "New Jersey Rules."

   10. Based on my training and experience, I have become familiar with particular substances used as performance-enhancing drugs ("PEDs") in the world of professional horseracing. Those include:

a.  Customized Analgesics: Referred to as "pain shots" or "joint blocks," customized analgesics contain various pain-relieving substances, including snake venom, used to deaden a horse's nerves and block pain. Among other things, customized analgesics mask physical injuries in a racehorse, which can cause a racehorse to overexert itself during periods of intense physical exercise, and thereby sustain a leg fracture or break during a race. In this case, and as set forth in more detail below, such PEDs include snake venom.

b.  Bronchodilators: Referred to by the Target Subjects as "Bronk," or "breather" drugs, these customized bronchodilators are designed to increase a horse's oxygen intake. Among other things, bronchodilators lessen fatigue, which cause the racehorse to perform beyond its natural abilities, thereby increasing the risk of injury while racing.

c.  "Red acid": "Red acid" is a term used by the Target Subjects to refer generally to customized PEDs designed, in part, to reduce inflammation in joints, thereby improving a horse's race performance. Similar to customized analgesics, "red acid," among other things, is administered to mask physical injuries in racehorses, thereby increasing the risk of injury while racing.

### B.  Poliseno, Grasso, and the Poliseno Target Premises

11.     GRASSO is a veterinarian who creates, produces, and sells adulterated and/or misbranded PEDs for race horses to horse trainers and owners.

12.     POLISENO operates a veterinary supply store and manages a firm called Equine Vet Supplies LLC ("Equine"). POLISENO has worked with GRASSO to obtain and distribute adulterated and/or misbranded drugs, including those created and sold by GRASSO.[2]

---

[2] On or about February 26, 2020, GRASSO and POLISENO, among others, were indicted in a still-sealed indictment filed in the Southern District of New York, *United States v. Grasso et al.*, 20 Cr. 163.

13.     The Poliseno Target Premises are located at                    , Hartley, Delaware, 19953. Publicly available property data provided by Kent County, Delaware, confirms that the Poliseno Target Premises belong to POLISENO. As set forth in more detail below, and as reflected on materials shipped in furtherance of the Subject Offenses, as well as on publicly accessible data provided by Delaware Department of State, Division of Corporations, the Poliseno Target Premises are also the principal address of Equine, the company through which POLISENO, among others, engage in the Subject Offenses.

<u>The Target Subjects, including Poliseno, Discuss Illicit Substances</u>

14.     POLISENO has had numerous intercepted oral conversations over a cellular telephone with GRASSO regarding the supply of drugs to horse trainers and owners. Over cellular phones, POLISENO has also discussed using veterinary licenses associated with GRASSO and another veterinarian to obtain prescription drugs for resale – drugs that POLISENO could not order directly insofar as he lacks the license to make orders for those products.

15.     For example, in or about October 2019, POLISENO discussed with GRASSO, in substance and in part, POLISENO's difficulty in obtaining certain drugs from compounding[3] pharmacies because he had, up to that point, used the license of another veterinarian (the "Deceased Vet"), but that veterinarian had died, threatening POLISENO's ability to continue purchasing products under his license: "[I]t [the Deceased Vet's death] puts me in a lot of trouble. Because now that they know he is dead I can't buy it through any suppliers or anything under his license. You know? . . . I just can't buy from the distributors unless you have a veterinarian license. Like I can't buy from Midwest, MWI, Rapid or any of them unless you have a veterinarian

---

[3] "Compounding" refers to the combination or mixing of ingredient substances to create a customized mediation.

7

license." In that conversation, GRASSO offered to allow POLISENO to use his own veterinary license in place of the Deceased Vet's license.

16. On or about November 1, 2019, POLISENO, on a recorded telephone call over the Grasso Phone, arranged with GRASSO to order PED components using GRASSO's name and licensing information, and to ship the drugs to GRASSO, for a later transfer to POLISENO.

Illicit Substances are Shipped from the Poliseno Target Premises

17. A confidential source ("CS-7")[4], at the direction of law enforcement, has obtained PEDs from GRASSO multiple times between in or about August 2019 through at least in or about January 2020, while representing to GRASSO that CS-7 was a horse trainer. CS-7 has communicated with GRASSO via texts and audio calls to the Grasso Phone to coordinate the purchase of these products and to transmit payment information.

18. Among the substances CS-7 purchased from GRASSO include a "bleeder" medication, intended to help abate bleeding in a horse's lungs during strenuous exercise, a "breathing" medication, intended to help a horse's ability to respire, and bottles of snake or cobra venom, which are intended to be injected in a horse's joints to deaden the nerves. In all cases, these drugs were misbranded and adulterated insofar as they are manufactured in non-FDA registered facilities, bear inadequate labeling information, and GRASSO provided these medications without conducting any examination of CS-7's horses to determine if there was any medical need for these substances (to the extent that any of these drugs could have been prescribed by a veterinarian, prescription drugs administered without a valid prescription are misbranded).

---

[4] CS-7 began cooperating with the investigation in the hope of obtaining a benefit with respect to a then-pending state offense that has since resolved, but no promises were made regarding the outcome of those state charges. CS-7 has no known prior convictions. Information provided by CS-7 has been corroborated by, among other things, intercepted wire and electronic communications, and agents have found CS-7 to be reliable and credible.

19.   CS-7 also knew POLISENO and his business from CS-7's work in the racing

industry prior to work with the FBI and knew POLISENO to be a distributor of PEDs. In the course

of this investigation, CS-7 has communicated with POLISENO via telephone calls to coordinate

the purchase of these products.

20.     Between in or about October 2019 through at least in or about February 2020, CS-

7 has ordered from POLISENO multiple adulterated and/or misbranded drugs on at least four

separate occasions. On each of these occasions, the shipments of these products were made using

packaging indicating a return address of the Poliseno Target Premises. On each occasion, CS-7

spoke directly with POLISENO to place the order.

a.  For example, on or about October 23, 2019, CS-7 placed two telephone calls to

POLISENO. The first went to a voicemail box purporting to be for Deceased Vet's office. The

second call, to the same telephone number, was answered by a woman identifying herself as

POLISENO's wife who was, at that time, in POLISENO's office. POLISENO then took the

telephone and spoke with CS-7, who engaged POLISENO in a discussion of CS-7's purported

need for PEDs for horses under CS-7's care and control. POLISENO made recommendations for

particular PEDs, including for an analgesic substance intended to be administered approximately

six hours prior to a race. Subsequently, on or about October 26, 2019, POLISENO shipped to CS-

7 a package that contained multiple bottles of the PEDs of the kinds discussed on October 23,

2019, along with an invoice issued by Equine. The return address on the package containing these

drugs was the address of the Poliseno Target Premises, which was also listed on the invoice as the

business address of Equine. The invoice contained in the package appeared to have been generated

by a computer and printed on a connected printer. In addition to listing the address of the Poliseno

Target Premises, the invoice listed an email address for use in contacting Equine

(equinevetsupplies@gmail.com), [5] and an indication that this particular purchase would be paid for by check.

b.  On or about December 9, 2019, POLISENO, while on a call with CS-7 during which CS-7 placed an order for additional PEDs, advised CS-7 regarding the administration of POLISENO's misbranded and adulterated PEDs, explaining that CS-7 should "blast them" six hours before the race started. In my training and experience I am aware that when saying "blast them," POLISENO is suggesting that CS-7 administer PEDs to racehorses via injection. POLISENO further agreed to ship to CS-7 an order of "red acid" (an analgesic drug), "Bronk" (a bronchodilator), "and two vials of snake venom" (also used as an analgesic).

c.  On or about December 12, 2019, CS-7 received the ordered drugs in a package bearing the address of the Poliseno Target Premises as the return address. Each of those PEDs was adulterated and misbranded for the reasons described above, namely that they were inadequately labeled with little information regarding content or directions for use, were provided as "prescription" drugs without a valid prescription, and/or were manufactured in non-FDA registered facilities. Inside the outermost packaging was a second package sent by "Midwest Veterinary Supply" to "Equine Vet Supplies" at the Poliseno Target Premises. Inside that interior package were the ordered drugs and invoices from Equine. Moreover, this shipment contained another computer-generated invoice bearing substantially the same categories of information described above. Finally, this shipment contained three pages (apparently also printed from a computer) reflecting Equine's product list. A photograph reflecting the invoice, the product list, and the various PEDs received on this day, follows:

---

[5] A preservation request has been placed for this account, but the content has not yet been obtained via warrant or otherwise.



d.  Notably, the "Bronk" supplied by POLISENO in the December 12 shipment was in a bottle identical to bottles of the same drug previously purchased from GRASSO. The label of GRASSO's "Bronk" was identical to the labeling of the "Bronk" provided to CS-7 by POLISENO, indicating that POLISENO's firm, Equine, is a distributor of, among other drugs, PEDs created and sold by GRASSO. Because the December 12, 2019, shipment of PEDs from POLISENO originated (as did all of POLISENO's shipments) from the Poliseno Target Premises, I submit that this fact establishes that POLISENO maintains a supply of GRASSO's misbranded and adulterated products at the Poliseno Target Premises, which POLISENO then ships upon request by POLISENO's customers.

e.  Most recently, on or about February 6, 2020, CS-7 again received a shipment of drugs, including "Bronk" in labeling identical to that created and used by GRASSO. Again, these drugs were sent in a package listing the Poliseno Target Premises as the return address. Moreover,

11

this shipment appeared to have been prepared using a cardboard box that previously had been sent to the Poliseno Target Premises and to which was affixed with its own shipping label directed to the address of Poliseno Target Premises (the "Underlying Label"). However, the name of the purported recipient on the Underlying Label was not POLISENO, but rather "Theresa Kothstein, DVM," who is listed on publicly available websites as a veterinarian practicing in Delaware. In light of the use by POLISENO of the identity of the Deceased Vet, described above, I respectfully submit that the Underlying Label indicates that POLISENO has also used the identity of Dr. Kothstein to receive PEDs or substances for the compounding of PEDs at the Poliseno Target Premises.

21.    Based on the shipments from the Poliseno Target Premises (and the Underlying Label found in connection with one of those shipments, described above), and based on my training and experience, there is reason to believe that the Poliseno Target Premises are used to store, package, and ship various PEDs, including those promoted and sold by Equine. Moreover, in light of the Poliseno Target Premises' status as the principal place of POLISENO's business on behalf of Equine, I submit that probable cause exists to believe that the Poliseno Target Premises will include evidence reflecting the collection of orders from POLISENO's PED customers, POLISENO's recording of those orders (including through the invoicing of such orders), and evidence of payment for such order. Moreover, based on my training and experience, from my involvement in this investigation, and as reflected in part above, I further submit that probable cause exists to believe that the Poliseno Target Premises will contain correspondence and records pertaining to the procurement, development, manufacture, shipment, purchase, sale, or distribution of adulterated and/or misbranded drugs including, but not limited to envelopes, letters, mailings, electronic mail, chat logs, electronic messages, books, ledgers, and records bearing on the

production, reproduction, receipt, shipment, orders, requests, trades, purchases, or transactions involving misbranded and/or adulterated drugs.

### C.   Probable Cause Justifying Search of ESI

22.     As discussed above, based on my review of intercepted communications, I have learned that POLISENO has used cellular telephones to send and receive communications and to place and receive phone calls in furtherance of the Subject Offenses. I have further learned that individuals may use computers to coordinate details regarding the purchase and sale of PED or PED component parts among other things, and, in the case of POLISENO, to create product lists and invoices for provision to their customers. Indeed, the invoices provided to CS-7 not only appear to be computer generated, but also reflect an email address specifically associated with Equine.

23.     Based on my training and experience, I know that individuals who engage in criminal activity of the type described above commonly use electronic devices to access websites used for illegal activity, communicate with co-conspirators online, keep track of co-conspirator's contact information, or keep a record of illegal transactions or criminal proceeds for future reference. As a result, they often store data on their computers related to their illegal activity, which can include logs of online "chats" with co-conspirators, email correspondence, contact information of co-conspirators, including telephone numbers, email addresses, and identifiers for instant messaging and social medial accounts, or records of illegal transactions or the disposition of criminal proceeds.

24.     Based on my training and experience, I also know that, where electronic devices are used in furtherance of criminal activity, as they are here, evidence of the criminal activity can often be found months or even years after it occurred. This is typically true because:

- Electronic files can be stored on a hard drive for years at little or no cost and users thus have little incentive to delete data that may be useful to consult in the future.

- Even when a user does choose to delete data, the data can often be recovered months or years later with the appropriate forensic tools. When a file is "deleted" on a home computer, the data contained in the file does not actually disappear, but instead remains on the hard drive, in "slack space," until it is overwritten by new data that cannot be stored elsewhere on the computer. Similarly, files that have been viewed on the Internet are generally downloaded into a temporary Internet directory or "cache," which is only overwritten as the "cache" fills up and is replaced with more recently viewed Internet pages. Thus, the ability to retrieve from a hard drive or other electronic storage media depends less on when the file was created or viewed than on a particular user's operating system, storage capacity, and computer habits.

- In the event that a user changes computers, the user will typically transfer files from the old computer to the new computer, so as not to lose data. In addition, users often keep backups of their data on electronic storage media such as thumb drives, flash memory cards, CD-ROMs, or portable hard drives.

25. Based on the foregoing, I respectfully submit there is probable cause to believe that POLISENO and the Target Subjects are engaged in the Subject Offenses, and that evidence of their criminal activity is likely to be found in the Poliseno Target Premises and on electronic media found in the Poliseno Target Premises.

## III. Procedures for Searching ESI

### A. Execution of Warrant for ESI

26. Federal Rule of Criminal Procedure 41(e)(2)(B) provides that a warrant to search for and seize property "may authorize the seizure of electronic storage media or the seizure or copying of electronically stored information . . . for later review." Consistent with Rule 41, this application requests authorization to seize any computer devices and storage media and transport them to an appropriate law enforcement facility for review. This is typically necessary for a number of reasons:

- First, the volume of data on computer devices and storage media is often impractical for law enforcement personnel to review in its entirety at the search location.

14

- Second, because computer data is particularly vulnerable to inadvertent or intentional modification or destruction, computer devices are ideally examined in a controlled environment, such as a law enforcement laboratory, where trained personnel, using specialized software, can make a forensic copy of the storage media that can be subsequently reviewed in a manner that does not change the underlying data.

- Third, there are so many types of computer hardware and software in use today that it can be impossible to bring to the search site all of the necessary technical manuals and specialized personnel and equipment potentially required to safely access the underlying computer data.

- Fourth, many factors can complicate and prolong recovery of data from a computer device, including the increasingly common use of passwords, encryption, or other features or configurations designed to protect or conceal data on the computer, which often take considerable time and resources for forensic personnel to detect and resolve.

**B. Review of ESI**

27.     Following seizure of any computer devices and storage media and/or the creation of forensic image copies, law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) will review the ESI contained therein for information responsive to the warrant.

28.     In conducting this review, law enforcement personnel may use various techniques to determine which files or other ESI contain evidence or fruits of the Subject Offenses. Such techniques may include, for example:

- surveying directories or folders and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files);

- conducting a file-by-file review by "opening" or reading the first few "pages" of such files in order to determine their precise contents (analogous to performing a cursory examination of each document in a file cabinet to determine its relevance);

- "scanning" storage areas to discover and possibly recover recently deleted data or deliberately hidden files;

15

- performing electronic keyword searches through all electronic storage areas to determine the existence and location of data potentially related to the subject matter of the investigation[6]; and

- reviewing metadata, system information, configuration files, registry data, and any other information reflecting how, when, and by whom the computer was used.

29.     Law enforcement personnel will make reasonable efforts to restrict their search to data falling within the categories of evidence specified in the warrant. Depending on the circumstances, however, law enforcement personnel may need to conduct a complete review of all the ESI from seized devices or storage media to evaluate its contents and to locate all data responsive to the warrant.

### C.  Return of ESI

30.     If the Government determines that the electronic devices are no longer necessary to retrieve and preserve the data, and the devices themselves are not subject to seizure pursuant to Federal Rule of Criminal Procedure 41(c), the Government will return these items, upon request. Computer data that is encrypted or unreadable will not be returned unless law enforcement personnel have determined that the data is not (i) an instrumentality of the Subject Offenses, (ii) a fruit of the criminal activity, (iii) contraband, (iv) otherwise unlawfully possessed, or (v) evidence of the Subject Offenses.

### IV.  Conclusion

31.     Based on the foregoing, I submit that probable cause exists to believe that the Poliseno Target Premises, described in Attachment A, contain the items listed in Attachment B,

---

[6] Keyword searches alone are typically inadequate to detect all relevant data. For one thing, keyword searches work only for text data, yet many types of files, such as images and videos, do not store data as searchable text. Moreover, even as to text data, there may be information properly subject to seizure but that is not captured by a keyword search because the information does not contain the keywords being searched.

which are believed to be evidence, fruits, property designed for use, intended for use, or used in committing violations of 18 U.S.C. § 1341 (mail fraud); 18 U.S.C. § 1343 (wire fraud); 18 U.S.C. § 1349 (conspiracy to commit mail and wire fraud); and 21 U.S.C. §§ 331, 333, 352 (misbranding of drugs and devices).

32. In light of the confidential nature of the continuing investigation, I respectfully request that this affidavit and all papers submitted herewith be maintained under seal until the Court orders otherwise.

33. Based on my training and experience and my participation in this investigation, I have learned that horse trainers, and those involved in the racehorse industry, commonly arise and tend to their horses in the very early morning hours (prior to 6 a.m.). Consequently, I respectfully request that the search warrant permit law enforcement agents to execute the search in the very early morning hours (prior to 6 a.m.) in order to ensure that the search is completed contemporaneously with other planned searches that are likely to be executed in the early morning hours as part of this investigation, to prevent any destruction of evidence.

DONALD L. FISHER
Special Agent
Federal Bureau of Investigation

Sworn to before me on
_6_ day of March, 2020

HON. MARY PAT THYNGE
CHIEF UNITED STATES MAGISTRATE JUDGE
DISTRICT OF DELAWARE

17